24 N.Y.2d 421 (1969)
The People of the State of New York, Respondent,
v.
Nathaniel Brown, Appellant.
Court of Appeals of the State of New York.
Argued March 4, 1969.
Decided April 17, 1969.
Robert L. Walker and Anthony F. Marra for appellant.
Frank S. Hogan, District Attorney (William C. Donnino and Michael R. Juviler of counsel), for respondent.
Chief Judge FULD and Judges BURKE, BERGAN and KEATING concur with Judge BREITEL; Judge JASEN dissents and votes to affirm in a separate opinion in which Judge SCILEPPI concurs.
*422 BREITEL, J.
Defendant appeals from his conviction for unlawful possession of a narcotic drug (Public Health Law, § 3305) after a plea of guilty. He contends that his motion to suppress under section 813-c of the Code of Criminal Procedure was improperly denied after a hearing.
Defendant's sole contention is that there was no probable cause to make the arrest and, therefore, the search following the arrest was illegal (Code Crim. Pro., § 177; e.g., People v. Loria, 10 N Y 2d 368, 373).
The only witness at the suppression hearing was Detective Odesto, the arresting officer. He testified that at 11:45 P.M., on March 13, 1967, in the vicinity of 126th Street and Eighth Avenue in Manhattan, "an area where any narcotics can easily be had", he had observed the conduct of the defendant and an unidentified party: "I observed the defendant, Mr. Brown, in the company of a person whom I suspected of being a narcotics addict. There came a time when that person that was with Mr. Brown walked away from him and entered a building at 126th Street and came out shortly thereafter and rejoined Mr. Brown. I observed Mr. Brown and that other person come close together. I observed what appeared to be as a movement of hand. At that time I started to go across the street and intercepted the two persons when Mr. Brown walked in my direction [with "a fast shuffling gait"] and the other *423 person walked in the opposite direction. I met Mr. Brown in the middle of the intersection and confronted him and told him I was a police officer."
Detective Odesto described the procedures followed generally during illicit sales of narcotic drugs: "That particular area at 126th Street and 8th Avenue, most of its persons engaged in the selling of narcotics do not carry narcotics on them. They usually have a place where it is stored in or carried by someone else. This is why I did not intercept that second person in the initial moving away of the defendant. On the second approach of this person, by the time I was able to position myself where I could possibly apprehend him, it was too late. Already he had walked away. In other words, what I'm saying is that usually the person would have a conversation with the potential seller, give him his money and order whatever it is, and then that second person, or the potential seller, will go to his place where he stores the narcotics and bring it back, give it to that person, and they'll go in opposite directions." Although Detective Odesto did not so testify, it may be inferred that the arrest was made because he believed that the acts of the defendant indicated that a sale of narcotics was occurring.
The observed activity on which the arrest was based is limited: a high crime area, a suspected narcotic addict, a meeting, parting, return, and movement of hands.
Although the observed acts of the defendant and the suspected narcotic addict were not inconsistent with a culpable narcotics transaction, they were also susceptible of many innocent interpretations, even between persons with a narcotics background. The behavior, at most "equivocal and suspicious", was not supplemented by any additional behavior raising "the level of inference from suspicion to probable cause" (see People v. Corrado, 22 N Y 2d 308, 311, 313). Thus, for example only, there was no recurring pattern of conduct sufficient to negate inferences of innocent activity (cf. People v. Smith, 21 N Y 2d 698; People v. Valentine, 17 N Y 2d 128, 132), no overheard conversation between the suspects that might clarify the acts observed (cf. People v. Cohen, 23 N Y 2d 674), no flight at the approach of the officer (cf. People v. White, 16 N Y 2d 270), and no misstatements when questioned about observed activity (People v. Brady, 16 N Y 2d 186).
*424 The logical and practical problem is that even accepting ungrudgingly, as one should, the police officer's expertness in detecting a pattern of conduct characteristic of a particular criminal activity, the detected pattern, being only the superficial part of a sequence, does not provide probable cause for arrest if the same sketchy pattern occurs just as frequently or even more frequently in innocent transactions. The point is that the pattern is equivocal and is neither uniquely nor generally associated with criminal conduct, and unless it is there is no probable cause. Thus, for example, the observation of a known or obvious prostitute talking to a man she meets (or accosts) on the street does not establish probable cause. More of a pattern must be shown, either by proof of the conversation or ensuing culpable conduct.
Nor does it suffice to reason from the results of other searches, conducted under similar circumstances, to establish probable cause. There will be too many times in which the search made in the same circumstances yields no contraband and the transaction ends up in a nonarrest which, of course, is not recorded.
It would be dangerous, indeed, to find probable cause for arrest in every two-phased meeting of a narcotic addict and another, ending in a vaguely described "movement of hands".
Accordingly, the judgment of conviction should be reversed and the information dismissed.
JASEN, J. (dissenting).
It must be remembered that we are not considering the quantum of proof required for conviction of a crime. Rather, the issue facing the court is whether the arresting officer had reasonable grounds or probable cause for making an arrest and the incidental search.
Probable cause is not a philosophical concept existing in a vacuum  it is a practical and factual matter viewed in terms of the actual circumstances existing at the moment of arrest. As its very name implies, probable cause deals with the probabilities confronting police officers. "These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved." (Brinegar v. United States, 338 U. S. 160, 175.)
*425 Police officers patrolling the streets do not prearrange the setting within which they operate. They do not schedule their steps in the calm and reflective atmosphere of some remote law library. Events occur without warning and policemen are required as a matter of duty to act as a reasonably prudent policeman would under the circumstances as those circumstances unfold before him.
I adhere to the view that, when a police officer's training and experience in a specialized field is brought to bear, the reasonableness and prudence of his conduct cannot be divorced from the knowledge and expertise that he possesses relative to the observed events and the modus operandi of criminals. Conduct that is objectively innocent in the abstract or to the untrained layman is not shielded from the reasonable inferences that an experienced police officer may make. This court has acknowledged the specialized expertise of trained law enforcement officials (People v. Valentine, 17 N Y 2d 128, 132; People v. Brady, 16 N Y 2d 186, 189) as have the Federal courts (Terry v. Ohio, 392 U. S. 1, 27, 30; Bell v. United States, 254 F.2d 82, 86 [D. C. Cir., 1958], cert. den. 358 U. S. 885; Jackson v. United States, 302 F.2d 194, 196 [D. C. Cir., 1962]; cf. People v. Corrado, 22 N Y 2d 308, 313-314).
The question, therefore, is whether a police officer "in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested." (Jackson v. United States, supra, at p. 196; People v. Valentine, supra; People v. Brady, supra; Code Crim. Pro., § 177, subd. 1; Bell v. United States, supra.) And in analyzing the nature of a police officer's experience, due consideration should be given to his "trained instinctive judgment operating on a multitude of small gestures and actions impossible to reconstruct." (HARLAN, J., concurring opn. in Sibron v. New York, 392 U. S. 40, 78.)
Here, we are asked to judge the reasonableness of the actions taken by an experienced narcotics detective  an expert in the various circumstances surrounding unlawful traffic in narcotic drugs. In fact, the detective's expertise was so well established that defendant made no effort at trial to impeach his testimony. During the four years the detective had been with the Narcotics *426 Bureau, he had made some 300 arrests for violation of the narcotics laws, approximately 70% of which had resulted in convictions. Moreover, for three of his four years with the Narcotics Bureau the detective had operated in the same area in which defendant was arrested. Most significantly, the detective had learned the modus operandi of narcotic sellers in the area. Thus, he knew that the narcotics seller did not normally carry narcotics on his person, but would first engage a potential buyer in the streets and take his order and money for a certain quantity of narcotics. The seller would then go to the place where he had previously stored the narcotics, take the ordered amount, return to buyer and complete the deal.
Therefore, upon sighting defendant with a suspected narcotics addict following, step by step, this established modus operandi, it would have defied reason and common sense for the detective, considering his extensive knowledge of the manner in which drugs were sold and of the individual defendant was with, not to conclude that defendant had in fact bought narcotic drugs. Indeed, it was the detective's recurring experience with this modus operandi of a narcotics sale that wisely deterred him from intercepting the parties when the suspected addict first left defendant to get the drugs.
In People v. White (16 N Y 2d 270), this court held that there was probable cause for an arrest without a warrant upon "a showing that a known addict holding money in his hand and talking to the suspected drug peddler quickly put the money away and left the scene when the detective approached." (Id., at p. 273.) Likewise, in People v. Smith (21 N Y 2d 698), probable cause was found in the observations by a police officer of unknown persons knocking on an apartment door and, after short conversations with the occupants, handing money to them. Although the conduct observed by the police officers in White (supra) and Smith (supra) may be objectively consonant with innocence, it gave rise to probable cause when examined from the viewpoint of an experienced and knowledgeable police officer.
When the conduct of defendant and the suspected addict are viewed in light of the totality of the detective's observations, knowledge and expertise, it is clear that it was reasonable for the detective to believe that a crime had been committed. We *427 require law enforcement officials to be reasonable; we too must be reasonable in applying this standard.
Accordingly, the judgment of conviction should be affirmed.
Judgment reversed and the information dismissed.